OPINION
{¶ 1} The City of Dayton appeals, pursuant to R.C. § 2506.04, from the trial court's order overruling its objections to a magistrate's decision that appellee Richard Wickline did not violate a City residency requirement.
{¶ 2} The present appeal stems from events that occurred while Wickline was employed as a Dayton firefighter in 1998. In August of that year, the City received a complaint that Wickline was not residing within the City limits, as required by the Dayton City Charter and a City ordinance. After conducting an investigation, the City determined that the complaint had merit. As a result, the City charged him with failing to reside within the City. Wickline and the City subsequently both presented evidence at a June 17, 1999, departmental hearing. Following the hearing, Wickline was found guilty, and the City terminated his employment effective July 28, 1999. He appealed to the civil service board, which conducted its own hearing in January, 2001. The civil service board disaffirmed Wickline's termination on January 25, 2001, and ordered him reinstated. On February 9, 2001, the City appealed to the Montgomery County Common Pleas Court. Thereafter, the matter was referred to a magistrate, who affirmed the civil service board's decision. The City filed objections to the magistrate's decision. On January 31, 2002, the common pleas court overruled the City's objections and affirmed the decision of the magistrate. The City then filed the present appeal, advancing two assignments of error for our review. First, it contends the trial court erred by misinterpreting our prior case law regarding Dayton's residency requirement. Second, it argues that the trial court erred by finding a preponderance of reliable, probative and substantial evidence to support the civil service board's decision that Wickline did not violate the residency requirement.
{¶ 3} Upon review we find both assignments of error to be unpersuasive. In its first assignment of error, the City contends the trial court misinterpreted our decisions in Harmon v. City of Dayton
(July 26, 1996), Montgomery App. No. 15555 ("Harmon II"), and Harmon v.City of Dayton (July 20, 2001), Montgomery App. No. 18725, 2001-Ohio-1544 ("Harmon III"), both of which included an analysis of the City's residency requirement. In its appellate brief, however, the City fails to explain precisely how the trial court misinterpreted our decisions in those cases. Instead of arguing that the trial court misinterpreted our two prior decisions, the City's real argument appears to be that the trial court simply reached a conclusion that is not supported by the facts in the present case. See Brief of Appellant at 8-12.
{¶ 4} In any event, we carefully have reviewed the trial court's decision and our prior rulings in Harmon II and Harmon III. Having conducted that review, we are persuaded that the trial court correctly interpreted both decisions. As in both Harmon II and Harmon III, the present dispute concerns whether a City employee violated Section 102(A) of the Dayton City Charter and Dayton City Ordinance No. 2558, both of which provide as follows:
{¶ 5} "All employees in the Civil Service of the City of Dayton, appointed after the effective date of this Charter Section, must and shall be actual residents of and physically live in the City of Dayton at the time of their appointment, and shall continue to be actual residents and physically live in the City of Dayton during the term of their employment." In Harmon III, we reasoned that the foregoing standard requires City employees to spend significant parts of each day at a household within the City for purposes consistent with residence. We also reasoned that the standard "demands that civil service workers live day-to-day within the City without requiring them to prove subjective domiciliary intent, i.e., the intent to make the location a permanent home and to remain there indefinitely."
{¶ 6} Similarly, in Harmon II, we construed key phrases in the City charter provision and ordinance at issue. In particular, we interpreted the phrases "actual residence" and "physically live" as requiring "being physically present and living at a particular location as a householder or member of a household for significant parts of each day for important purposes consistent with residence." In addition, we interpreted the phrase "important purposes consistent with residence" as including "where a person eats, where he sleeps, where his family eats and sleeps, where he bathes, where he has telephone service, where he receives mail, or other similar activities." Finally, in Harmon II, we noted that the City charter provision and ordinance do not require employees to establish their "domicile," or true, fixed, and permanent home, within the City.
{¶ 7} In its January 31, 2002, decision, the trial court cited both Harmon II and Harmon III and accurately set forth the foregoing law, which it found to govern the present dispute. Doc. #21 at 3. Nothing in the trial court's recitation of the legal standards contained inHarmon II and Harmon III suggests that it misinterpreted either decision.[1] Accordingly, we overrule the City's first assignment of error.
{¶ 8} In its second assignment of error, the City contends that the trial court erred by finding a preponderance of reliable, probative and substantial evidence to support the civil service board's decision that the City failed to prove a violation of its residency requirement. Upon review, we find this assignment of error to be without merit. The present appeal arises under R.C. § 2506.01, et seq., which provides for an appeal to the common pleas court from the final order of an administrative agency such as the Dayton Civil Service Board and, thereafter, for an appeal to this court from the common pleas court. The scope of judicial review of an administrative order is set forth in R.C. § 2506.04, which states:
{¶ 9} "The court may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record. Consistent with its findings, the court may affirm, reverse, vacate, or modify the order, adjudication, or decision, or remand the cause to the officer or body appealed from with instructions to enter an order, adjudication, or decision consistent with the findings or opinion of the court. The judgment of the court may be appealed by any party on questions of law as provided by the Rules of Appellate Procedure and, to the extent not in conflict with those rules, Chapter 2505 of the Revised Code."
{¶ 10} In Smith v. Granville Twp. Bd. of Trustees,81 Ohio St.3d 608, 1998-Ohio-340, the Ohio Supreme Court reiterated the standards of review that common pleas courts and appellate courts should apply when reviewing agency orders. In particular, the Smith court noted that a common pleas court "must weigh the evidence in the record" to determine whether an agency's order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence.[2] Id. at 612. The common pleas court's decision then may be appealed to an appellate court "`on questions of law.'" Id. at 613. "`An appeal to the court of appeals, pursuant to R.C. § 2506.04, is more limited in scope and requires the court to affirm the common pleas court unless the court of appeals finds, as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative and substantial evidence.'" Id., quoting Kisil v. Sandusky (1984)12 Ohio St.3d 30, 34.
{¶ 11} Although the trial court in the present case referred the City's appeal to a magistrate, the trial court remained obligated to conduct its own independent review of the evidence and the civil service board's order. City of Dayton v. Whiting (1996), 110 Ohio App.3d 115,118-120. In its January 31, 2002, order, the trial court recognized this obligation and properly conducted its own review of the record. Doc. #21 at 1-2. The trial court found that the civil service board's order disaffirming Wickline's termination was supported by the preponderance of the evidence. Doc. #21 at 3. In the trial court's view, it was "not clear from the record that Wickline consistently spent significant parts of each day at any one location," whether inside or outside of the City. Doc. #21 at 4. As a result, the trial court held that the City failed to meet its burden of proving that Wickline had violated the residency rule by living outside the City. Id. at 4-5.
{¶ 12} Upon review, we cannot say, as a matter of law, that the decision of the trial court, or the magistrate, is unsupported by a preponderance of reliable, probative and substantial evidence. To the contrary, we agree with both the trial court and the magistrate that the civil service board's order disaffirming Wickline's termination is supported by the preponderance of the evidence. The record reflects that Wickline began his employment with the Dayton Fire Department in 1981, after the City had implemented its residency rule. Hearing Transcript at 24, 208. In 1995 Wickline lived with his wife and two children at 205 Redwood Avenue in the City of Dayton. Id. at 209-212. He and his wife separated that year, and she moved with their teenage children to 5589 Brantford Road, which is outside the City limits. Id. at 238-239. Shortly thereafter, Wickline purchased a residence at 3521 Riverside Drive, which is located inside the City limits. Id. at 239-240. The interior of the Riverside property was furnished, but it did not contain a washer or dryer. Wickline used a local laundry facility to wash his clothes. Id. at 257-258. Wickline's water usage at the Riverside property was relatively low while he was employed as a firefighter. Id. at 184-190. According to a City of Dayton water engineering employee, he used at least 20 to 25 gallons of water a day less over a 90-day period than the average person, who uses about 100 gallons per day. Id. at 193-194. When he was not working, Wickline usually ate meals at the Riverside address or a restaurant. Id. at 218. He kept no clothing at the Brantford property. Id. at 222. As a firefighter, he lived at the fire station for 24-hour shifts and then he was off duty for 48 hours. Id. at 260-261. In his free time, he operated an electrical repair service out of the Riverside residence. Id. at 280-281. Wickline used the Riverside address for many purposes, including his driver's license, tax returns, motor vehicle registrations, insurance forms, voter registration, and census. In addition, he received bills and other mail at the Riverside residence, which was listed as his home address in the telephone book. Id. at 250-260, 262-264.
{¶ 13} In August, 1998, the City received a complaint that Wickline was residing outside of Dayton. At the City's request, a professional investigator commenced a preliminary inquiry into the matter. The investigator first spoke to an employee of a transmission shop adjacent to the Riverside residence. The employee stated that someone operated an electrical business out of the property. The employee also stated that he was unsure whether anyone lived there. Id. at 69-70, 110. The investigator then spoke to Ester Keyes, the record owner of the Riverside property.[3] Keys stated that she did not think anyone lived at the property and that she was in the process of selling it. Id. at 70-71, 141, 151. The investigator also stopped at the Riverside residence once at approximately 11:10 a.m. and found Wickline in the back yard. Id. at 107. Without revealing the purpose of his visit, the investigator spoke with Wickline, who indicated that he lived there but was not home very often. Id. at 71-72. Finally, as part of his preliminary work, the investigator observed the Brantford residence in the early morning twice in December, 1998. On both occasions, Wickline was scheduled to work at the fire station at 7:00 a.m. At approximately 6:00 a.m. on both dates, the investigator saw Wickline's van parked in front of the Brantford home. Id. at 74-77. On both dates, Wickline left the Brantford residence at approximately 6:30 a.m. and drove to the Riverside property. Id. After spending about three minutes inside the house, he left the Riverside residence and went to the fire station, arriving shortly before 7:00 a.m. On a third occasion in December, 1998, the investigator observed Wickline's van at the Brantford home near midnight. The investigator continued his surveillance until 7:30 a.m. but no one left the house. Id. at 116-117.
{¶ 14} After the foregoing preliminary investigation, the City instructed the investigator to conduct additional surveillance. As a result, the investigator conducted all-night surveillance of Wickline on five occasions in April, 1999. The investigator selected five nights when Wickline was scheduled to work a 24-hour shift the next morning. On each of the five nights, the investigator began his surveillance between 8:00 p.m. and 9:00 p.m. and continued until Wickline left for the fire station the following morning. Id. at 83-84. On the first night, Wickline arrived at the Brantford residence at approximately 1:25 a.m. He then left briefly but returned to Brantford at approximately 2:00 a.m. and entered the house. He then left the Brantford home at 6:36 a.m. and drove to the Riverside residence. After spending a few minutes inside the Riverside home, he drove to work. Id. at 85. On the second, third, and fourth nights, the investigator saw Wickline's van at the Brantford residence between 8:00 p.m. and 9:00 p.m. Wickline left after 6:00 a.m. each morning and drove to the Riverside residence. Each time, he spent a few minutes inside the Riverside house before driving to work. Id. at 88-90. On the fifth night, the investigator saw Wickline's van at the Brantford residence at approximately 10:15 p.m. Wickline remained there throughout the night and left at 6:31 the following morning. Once again, he drove to the Riverside residence, entered briefly and continued on to work. Id. at 91.
{¶ 15} Although Wickline admittedly spent many nights at the Brantford home, he normally went to the Riverside residence after completing a 24-hour shift at the fire station. Id. at 214, 269. At the Riverside home, he typically would take a shower, change clothes, sometimes eat something, return telephone calls, and possibly take a nap before leaving to do electrical work for his customers. Id. at 269. After finishing this work, he usually would return to the Riverside home where he again showered and changed clothes, cleaned his work vehicle, organized his electrical work schedule, returned phone calls and "putz[ed] around the house" before heading to the Brantford residence in the evening. Id. at 269-270.
{¶ 16} Dayton firefighter Norbert Engelman, who occasionally hired Wickline to perform electrical work at various rental properties, visited him at the Riverside address between six and twelve times. Id. at 319, 321. On two of those occasions, Engelman arrived shortly after 7:00 a.m. and awoke Wickline. Id. at 319. He also stopped once at noon and saw Wickline at the Riverside address. Id. at 320. On another occasion, Engelman visited Wickline at the Riverside residence around 9:00 p.m. Id.
{¶ 17} Based largely on the foregoing facts, the civil service board concluded that Wickline "spent significant parts of each day for important purposes consistent with residence at Riverside." See Order, attached to Doc. #1 at 5. As a result, the board found that the City failed to prove Wickline's violation of the residency requirement. In reaching this conclusion, the civil service board noted:
{¶ 18} ". . . From Riverside he went to work as a [f]irefighter, and from Riverside he ran his business as an electrical repairman. He kept his clothes at Riverside, received mail at Riverside, received telephone messages at Riverside, occasionally slept at Riverside, occasionally ate at Riverside, did his laundry at a nearby laundromat, listed Riverside as his address for important documents, and received at least one unannounced visitor over a period of time at Riverside. . . ." Id.
{¶ 19} The magistrate judge subsequently agreed with the civil service board, reasoning as follows:
{¶ 20} ". . . The DCSB did not act unreasonably when determining the City failed to prove the charge against Wickline. There is evidence of Wickline residing inside the City limits.
{¶ 21} "The City did not rebut Wickline's testimony that he took his laundry to a laundry mat for cleaning, which goes toward his low water usage. The City never followed or investigated what Wickline did in his off time, besides where he slept. Sleeping is only one criteria to help determine residency. The investigation never revealed if Wickline went outside the City limits after work and stayed outside the limits until work started again. The investigation never revealed where Wickline ate. He testified that he ate at different restaurants throughout the City. The City never rebutted this statement. The City never proved he did not receive visitors or telephone calls at the Riverside address. Wickline testified that he did not have call forwarding on his telephone. In addition, Lieutenant Norbert Engelman, Jr., testified he visited Wickline unannounced at his property on Riverside.
{¶ 22} "During the investigation of Wickline, the investigator stopped by Wickline's house unannounced. He encountered the son visiting his father and was even asked to take a photo of the two. The City never proved the son's visit was done in anticipation of the investigator stopping by. While the investigator testified that Wickline told him that he lived at Riverside but he was never home, that can be a fair assessment of the situation, but it does not mean Wickline was residing outside the City limits. Wickline was gone from his home for a whole day at a time. In addition, he was doing business as an electrical service man and spending the nights away from the house. He might think or feel that he is never there, but that does not mean that he is not residing in the City.
{¶ 23} "Finally, Wickline was a property owner of the Riverside residence. His house maintenance does not support or deny his residency status. He could have been just too busy to keep up on the grass cutting. In addition, when a violation was brought to his attention, he remedied it. The residency clause does not mandate the house be a newly constructed, perfect house which is kept immaculate. His lack of maintenance or the condition of the house is immaterial. This is especially true whereas here no one from the City observed the condition inside the house. Therefore, the overall condition cannot be stated as being against Wickline.
{¶ 24} "The DCSB had plenty of evidence which related to Wickline residing inside the City of Dayton. The City has the burden of proving the charge. The DCSB acted reasonably when it determined that the City had not meet [sic] its burden. . . ." Doc. #16 at 5-6.
{¶ 25} Finally, the trial court judge agreed "that the DCSB did not err in concluding that Wickline had abided by the residency requirement." Doc. #21 at 1. In particular, the trial court reasoned as follows:
{¶ 26} ". . . [T]here exists a preponderance of reliable, probative and substantial evidence to support the decision of the DCSB. The Court notes at the outset that the residency requirement is not formulaic, nor is there any bright-line rule. The City of Dayton places great importance on the rule that City employees spend `significant parts of each day for important purposes consistent with residence' at a City residence. While the court agrees that this is important, it is not clear from the record that Wickline consistently spent significant parts of each day at any one location, be it Brantford Road, the engine house, or Riverside Drive.
{¶ 27} "Wickline indicated that he sleeps at three different locations, the two mentioned above and at the engine house. Wickline also indicated that he ate at three locations, usually meals at the Riverside Drive location or at restaurants, and at Brantford Road for a snack. The record additionally shows that Wickline showered at two different locations, the Riverside Drive residence and the engine house when on duty. Because he is separated from his wife and does not live with his children, Wickline has shared no meals with his family.
{¶ 28} "The record indicates, however, that Wickline did spend a substantial number of nights at the Brantford Road address to spend time with his children when his wife was at work. The investigator hired to surveil Wickline testified that after conducting five nights of surveillance, he detected a pattern in Wickline's routine on the days before he went to work. Wickline would arrive at the Brantford Road address around nine o'clock in the evening and remain there until six thirty in the morning, whereupon he went to the Riverside address. Wickline remained at that location for `a few minutes' and then proceeded onto the engine house. Thus, on the days before Wickline would report for work, the investigator only observed where Wickline had slept the night before, not what he was doing during that day.
{¶ 29} "Additionally, the investigator did not surveil Wickline on the days he did not have to report to work the following day aside from periodically checking the Riverside Drive location to check for signs of occupation. Thus, the City could not present evidence of how Wickline spent a significant part of those days. Mindful that the record indicates that Wickline was not consistently physically present and living for significant parts of each day at any one location, the Court concludes that the City failed to show that Wickline violated the residency requirement.
{¶ 30} "Lastly, the record indicates that Wickline physically maintained the Riverside Drive property, kept all of his clothing there, and listed that address on his utility bills, driver's license, and tax returns. Perhaps most importantly, the Riverside Drive address and that telephone number were on file with the Dayton Fire Department as Wickline's contact information. The City of Dayton did not produce any evidence indicating that the Fire Department had difficulty contacting Wickline at the Riverside Drive location. Therefore, the Court concludes that there exists a preponderance of reliable, probative and substantial evidence to support the DCSB's decision that Wickline did not violate the residency requirement." Doc. #21 at 5.
{¶ 31} On appeal, the City disputes only four specific findings made by the trial court. First, the City contests the trial court's finding that "it is not clear from the record that Wickline consistently spent significant parts of each day at any one location[.]" The City reasons that Wickline, by his own admission, spent a significant part of each day at the Brantford home. Second, the City challenges the trial court's finding that Wickline "spen[t] a substantial number of nights at the Brantford Road address to spend time with his children when his wife was at work." The City contends that Wickline spent some evenings and nights at the Brantford home even when his wife was not at work. Third, the City disputes the trial court's finding that it "could not present evidence of how Wickline spent a significant part of [his non-working] days." According to the City, Wickline admittedly spent most of those evenings and nights at the Brantford residence. Fourth, the City contests the trial court's finding that it "did not produce any evidence indicating that the Fire Department had difficulty contacting Wickline at the Riverside Drive location." The City notes that Wickline's supervisors had his pager number and, therefore, could have contacted him even if he were not at the Riverside residence.
{¶ 32} Upon review, the foregoing arguments fail to persuade us that the trial court's decision is unsupported by a preponderance of reliable, probative and substantial evidence. With respect to the first argument, we agree with the City that Wickline appears to have spent many nights at the Brantford residence when he was not sleeping at the fire station on his 24-hour shift. The City properly notes that Wickline usually arrived at the Brantford residence in the evening and did not leave until around 6:30 a.m. the following day. On such days, then, we agree with the City that Wickline spent "significant parts" of his time (from around 9:00 p.m. until 6:30 a.m.) at the Brantford home. In its decision, however, the trial court merely noted that Wickline did not consistently spend significant parts of each day at any one location. This statement is actually true, given that Wickline worked 24-hour shifts at the fire station and, as a result, slept there every third night. In addition, the trial court noted that Wickline also sometimes spent the night at the Riverside residence. This conclusion is supported by the testimony of Norbert Engelman, who twice discovered Wickline asleep there early in the morning. Nevertheless, we do not discount the significance of the fact that Wickline frequently spent the night at the Brantford residence when he was not working a 24-hour shift at the fire station. The problem for the City is that this fact, while important, is not alone dispositive, and the substantial other evidence set forth supra and cited by the civil service board, the magistrate and the trial court reasonably supports a conclusion that Wickline also spent "significant parts" of his days at the Riverside address. Although we reasoned inHarmon III that a City employee must have his "principle place of abode within the City of Dayton," the evidence in this case reasonably supports a finding that Wickline's principle place of abode was on Riverside Drive, despite his frequent sleeping at the Brantford residence. As noted by the magistrate, sleeping is only one factor to help determine residency.
{¶ 33} In its second argument, the City challenges the trial court's finding that Wickline spent "a substantial number of nights at the Brantford Road address to spend time with his children when his wife was at work." As noted above, the City contends that Wickline spent some evenings and nights at the Brantford home even when his wife was not at work. Although the City's assertion is true, we find it to be of little significance. Throughout this litigation, the City has argued that its residency rule has no exceptions. As a result, the City has maintained, correctly we believe, that Wickline's reason for visiting the Brantford home is irrelevant. The pertinent issue is where he lived, not why he elected to do so. In our analysis of the City's first argument above, we acknowledged the important fact that he spent many evenings and nights at the Brantford residence. Regardless of whether his wife was home during his visits, the magistrate and the trial court reasonably concluded that the City failed to prove a violation of its residency rule.
{¶ 34} With respect to the City's third argument, we once again agree that Wickline spent many of his non-working evenings and nights at the Brantford residence. By his own admission, Wickline usually slept there. Insofar as Wickline spent from around 9:00 p.m. until 6:30 a.m. at the Brantford residence on days that he was not scheduled to work, we agree with the City that he spent a "significant part" of such days there. In our view, however, the trial court's observation that the City failed to "present evidence of how Wickline spent a significant part of [his non-working] days" referred not to where he slept on such days, but to what he did after waking. In other words, the trial court appears to have used the word "days" in reference to daylight hours. In any event, even if Wickline spent many evenings and nights at the Brantford residence when he was not scheduled to work the following day, the record contains substantial evidence to support the finding of the civil service board, the magistrate, and the trial court that he was a Dayton resident for purposes of the City's residency rule. As noted by the civil service board, the record contains ample evidence to support the conclusion that he "spent significant parts of each day for important purposes consistent with residence at Riverside." See Order, attached to Doc. #1 at 5. As a result, the civil service board, the magistrate and the trial court did not err in finding that the City failed to prove Wickline's violation of its residency requirement.
{¶ 34} The City's fourth and final argument is equally unpersuasive. As noted above, the City contests the trial court's observation that it "did not produce any evidence indicating that the Fire Department had difficulty contacting Wickline at the Riverside Drive location." In opposition to this finding, the City notes that Wickline's supervisors had his pager number and could have contacted him even if he were not residing at the Riverside home. We note, however, that the fire department had both Wickline's pager number and his regular telephone number at the Riverside residence. Tr. at 286. Although the fire department presumably could have contacted Wickline via his pager, he testified that he did not believe he ever had received "an official call from the pager." Id. As a result, it is reasonable to infer that if the fire department contacted Wickline during non-working hours, it did so using his Riverside telephone number. In any event, when viewing the evidence as a whole, we find the fact that Wickline was accessible by both pager and telephone to be of limited significance.
{¶ 36} In short, although Wickline often slept outside the City limits, the record nevertheless contains a great deal of evidence which reasonably supports a finding that he was physically present and living at the Riverside location as a householder for significant parts of each day for important purposes consistent with residence. The civil service board, the magistrate, and the trial court cited much of this evidence, which we have set forth above, and relied upon it in disaffirming Wickline's termination. Having reviewed the record, we cannot say, as a matter of law, that any of those decisions are unsupported by a preponderance of reliable, probative and substantial evidence. Smith,81 Ohio St.3d at 613, quoting Kisil, 12 Ohio St.3d at 34. Accordingly, we hereby affirm the judgment of the Montgomery County Court of Common Pleas.
{¶ 37} Judgment affirmed.
WOLFF, P.J., and YOUNG, J., concur.
[1] As noted above, the City's true argument appears to be that the trial court simply reached a conclusion that is not supported by the evidence in this case. In other words, the City does not appear to believe that the trial court applied an incorrect legal standard. Instead, the City appears to assert that the trial court applied the correct legal standard, as articulated in Harmon II and Harmon III, but in applying that standard simply reached a conclusion that is contrary to the evidence. This argument is fully set forth in the City's second assignment of error, and we will address it in that context.
[2] Although a trial court normally must find that an agency's order is supported by the preponderance of the evidence, we previously noted a slight modification of this requirement when, as in the present case, the appeal to the common pleas court is from an agency order that disaffirms a termination of employment.In City of Dayton v. Whiting (1996),110 Ohio App.3d 115, 123, we recognized that because the City bears the burden of proving an administrative charge against an employee, an agency order disaffirming a termination need not be supported by the preponderance of the evidence. "Rather, the issue for the trial court is whether, on the whole record, the [civil service board] acted unreasonably in determining that the City failed to prove the charges by the preponderance of the evidence." Id. We reasoned that if the standard of review were otherwise, the employee would bear a burden of proof in the trial court that he did not bear before the civil service board. Id. In the present case, the trial court failed to recognize this distinction and identified the issue before it as whether the agency's decision was supported by the preponderance of the evidence. See Doc. #21 at 2. Although application of this test imposed on Wickline a higher burden than we found appropriate in Whiting, he suffered no prejudice, as the trial court ultimately found that the civil service board's order was supported by the preponderance of the evidence. Id. at 3.
[3] The transcript of Wickline's civil service hearing indicates that Keyes remained the record owner of the property at the time of the investigation into his place of residence. At that time, it appears that Wickline was in the process of purchasing the Riverside home from Keyes on a land contract.